Benjamin ESPINOSA #74296

HDSP-PO Box 650

Indian Springs, NV. 89070-0650

PLAINTIFF, IN PROPER PERSON

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
* * * * *

BENJAMIN ESPINOSA V. GITTERE, ET. AL

PLAINTIFF                    DEFENDANT(S)

CASE NO. 3:21-CV-00205-ART-CLB

MOST HONORABLE JUDGE: ANNE RACHEL TRAUM

THE HONORABLE MAGISTRATE: CARLA

PLAINTIFFS RESPONSE TO DEFENDANTS'
SUMMARY JUDGMENT MOTION
[ECF NO. 62]
(with 'APPENDIX' VOL. I & II' filed
seperately but juxtiposition to
instant).

|| COVER SHEET ||

# = TABLE OF CONTENTS =

I. INTRODUCTION . . . . . . . . . . pg. 1 (FIRST)

II. LEGAL STANDARD . . . . . . . . . . pg. 2-6

  A. SUMMARY JUDGMENT (pg. 2-3)

  B. CONDITIONS OF CONFINEMENT - (pg. 3-5)

    FAILURE TO PROTECT

  C. RETALIATION - FIRST AMENDMENT (pg. 5-6)

III. CONCISE STATEMENT OF DISPUTABLE FACTS . . . . pg. 6-11

  A. FIRST AMENDMENT RETALIATION (pg. 6-8)

  B. EIGHTH AMENDMENT - COND OF CON. (pg. 8-11)

    (FAILURE TO PROTECT)

  C. EIGHTH AMENDMENT - DEL. IND SERMED NEED (pg. 11)

IV. ARGUMENTS IN SUPPORT OF DENIAL OF . . . pg. 11-19

  DEFENDANTS SUMMARY JUDGMENT MOTION

  A. RETALIATION (pg. 11)

    1. MOTIVE REVEALED [pg. 12-13]

    2. PERJURISTIC DECLARATION [pg. 13-16]

    3. PROXIMITY IN TIME [pg. 16-17]

    4. EXHAUSTION - RETALIATION [pg. 17-19]

V. EIGHTH AMENDMENT - COND OF CON. - FAILURE TO PROTECT . . . pg. 19-26

  A. ACKNOWLEDGED RIGHT TO BE PROTECTED (pg. 19)

  B. FAILURE TO PROTECT (pg. 20-24)

  C. INVESTIGATION (pg. 24-26)

VI. IRRELIVANT, BOILERPLATE, AND EXHAUSTING ARGUMENTS . . . pg. 26-

  A. SUPERVISOR LIABILITY (pg. 26-27)

  B. QUALIFIED IMMUNITY (pg. 27-28)

VII. CONCLUSION . . . . . . . . . pg. 28-29 (END)

= TABLE OF AUTHORITIES = PG 1 of 2      PG CITED

| | PG CITED |
|---|---|
| ANDERSON V. LIBERTY LOBBY, 477 US 242, 248; 106 Sct. 2505 (1986) | 2 |
| BROWN V. VALOFF, 422 F.3d 926, 942-43 (9Th Cir. 2005) * 18 | 18 |
| COLWELL V. BANNISTER 763 F.3d 1060, 1066 (9Th Cir 2014) | 22 |
| ELLINS V. CITY OF SIERRA MADRE, 710 F.3d 1049, 1064 (9Th Cir 2013) | 32 |
| FARMER V. BRENNAN, 51 US 625, 836; 114 S.Ct. 1970 (1994) | 3; 4; 5 |
| HELLING V. MCKINNEY, 509 US. 25, 31 (1993) | 3; 4; 5 |
| HUDSON V. PALMER, 466 US 517, 526-27; 104 S.Ct. 3194 (1984) | 3 |
| JACKSON V. MCINTOSH 90 F.3d 330, 332 (9th Cir. 1996) | 22 |
| JETT V. PENNER 439 F.3d 1091, 1096 (9Th Cir. 2006) | 22 |
| JOHNSON V. LEWIS, 217 F.3d 726, 731 (9Th Cir. 2000) | 3 |
| JONES V. BLANAS, 393 F.3d 918, 923 (9Th Cir. 2004) | 3 |
| MAYORAL V. SHEAHAN, 245 F.3d 934, 940 (9Th Cir. 2000) | 5 |
| NW. MOTORCYCLE ASS'N V. US DEPT. OF AGRIC., 18 F.3d 1468, 1472 (9Th Cir. 1994). | 2 / — |
| ORR V. BANK OF AM. NT. SA, 285 F.3d 764, 773 (9Th Cir. 2002) | 2 |
| PEARSON V. CALLAHAN, 555 US 223, 231 (2009) | 31 |
| RHODES V. CHAPMAN, 452 US 337; 101 S.Ct. 2392 (1981) | 4 |
| RHODES V. ROBINSON, 408 F.3d 934, 940 (9Th Cir 2004) | 12 |
| SANDOVAL V. LAS VEGAS METROPOLITAN POLICE DEPARTMENT 756 F.3d 1154, 1160 (9Th Cir. 2014) | 32 / — |
| SCHMIDT V. CONTRA COSTA CNTY, 695 F.3d 1122, 1132 (9Th Cir. 2012) | 2 |
| SONEMEKUM V. THRIFTY PAYLESS INC. 509 F.3d 979, 984 (9Th Cir. 2007) | 2 / — |
| STARR V. BACA, 652 F.3d 1202, 1206-07 (9Th Cir. 2011) | 31 |
| TARABOCHIA V. ADKINS 766 F.3d 1115, 1121 (9Th Cir. 2014). | 31 |
| THOMAS V. PONDER, 611 F.3d 1144, 1150 (9Th Cir. 2010) | 2; 5 |

(left margin, vertical) m 4 2 pg's ... TABLES pg.

= TABLE OF AUTHORITIES = PG 2 of 2     PG CITED

TOGUCHI V. CHUNG, 391 F.3d 1051, 1058 (9th cir.     ).     22

= OTHER AUTHORITIES =

Fed. R. Civ. P 10 (c)     5

Fed. R. Civ. P 56     6

Local Rule 56-1     6

PROSSER & KEETON SECTION 34 pp 213-44 Restatement (SECOND) of     4
         TORTS § 500  1965

= AUTHORITIES OF OTHER CIRCUITS =     PG CITED

FAULK V. CHARRIER, 262 F.3d 689, 698 (8th cir. 2001)     18

JERNIGAN V. STUCHELL, 304 F.3d 1030, 1032 (10th cir. 2002)     18

LEWIS V. WASHINGTON, 300 F.3d 829, 833 (10th Cir. 2002)     18

MILLER V. WILSON, 151 F.3d 292, 295 (5th cir. 1998).     18

= LATIN USAGE =     PG USE

AD NAUSEAM = wickedly sickening     16

SCILICET = Namely,     16

FALSO IN UNO, FALSO IN OMNIBUS = (phrase) "False in one, False in all"     10; 12; 14; 16; 24

TABLES PG 3 of 3 (LAST)

Benjamin Espinosa #74296
HDSP P0 Box 650
Indian Springs, NV. 89070-0650
Plaintiff, In proper person

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
\* \* \* \* \*

ESPINOSA ) CASE NO. 3:21-CV-00205-ART-CLB
    PLAINTIFF )
V. ) "PLAINTIFF'S RESPONSE TO DEFENDANTS'
GITTERE, ET. AL. ) MOTION FOR SUMMARY JUDGMENT"
    DEFENDANT(S) ) [ECF NO. 62]
     )

PLAINTIFF, Benjamin Espinosa, a pro se inmate litigating under the countinance of HAINES V. KERNER, does so moves this HONORABLE COURT to deny Defendants' (hyperbolic) motion for summary Judgment ("Sum. Jud."). This motion is based upon the following MEMORANDUM OF POINTS AND AUTHORITIES, pleading(s), paper(s), and exhibits on file herein.

= MEMORANDUM OF POINTS AND AUTHORITIES =

I. INTRODUCTION.

    Defendants' motion for sum. Jud. is solely reliant upon perjuristic declarations, deceitful arguments, possibly 'forged' documents, and reducible disputes.

    PLAINTIFF'S response will irradiate defendants' collective attempts to belittle and cover up their 'failures to protect', desguise retaliatory actions using predesigned defenses of medical concern, refusal to respond to grievances and kites to deny proper exhaustion, and complete disregard for this courts integrity; all to escape accountability of their gross violations of PLAINTIFFS constitutional rights.

Defendants have failed to meet their burden of establishing indisputable facts warranting the granting of their motion, other than dishonest declarations not supported by the evidence.

## II. LEGAL STANDARD

### A. SUMMARY JUDGMENT

Courts should liberally construe motions, pleadings, and papers filed by pro se inmates, avoiding applying sum. jud. rules strictly. THOMAS V. PONDER, 611 F.3d. 1144, 1150 (9th Cir. 2010).

The substantive law will identify which facts are material. Only disputes over facts that might effect the outcome of the suit under the governing law will properly preclude the entry of sum. jud.. Factual disputes that are irrelevant or unnecessary will not be counted. ANDERSON V. LIBERTY LOBBY, 477 US. 242, 248; 106 S.ct 2505 (1986).

A dispute is genuine only where a reasonable jury could find for the non-moving party. Id. Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute. SONEMEKUNI V. THRIFTY-PAYLES INC., 509 F.3d 979, 984 (9th Cir. 2007).

Ultimately, the moving party must demonstrate, on the basis of authenticated evidence that the record forecloses the possibility of a reasonable jury finding in favor of the non-moving party as to disputed material facts. ORR V. BANK OF AM. NT. SA., 285 F.3d 764, 773 (9th Cir. 2002).

At this stage the court's role is to verify whether reasonable minds could differ when interpreting the record, the court does not weigh the evidence or determine it's truth. SCHMIDT V. CONTRA COSTA CNTY., 695 F.3d. 1122, 1132 (9th Cir. 2012); NW. MOTORCYCLE ASS'N. V. US Dept. of

Agric., 18 F.3d. 1468, 1472 (9th cir. 1994).

For purposes of opposing Summary Judgment, The contentions offered by a pro Se litigant in motions and pleadings are admissable to The extent That the contents are based on personal knowledge and set forth facts That would be admissable into evidence, and The litigant attested under penalty of perjury That They were true and correct. JONAS V. BLANAS, 393 F.3d 918, 923 (9th cir. 2004).


B. CONDITIONS OF CONFINEMENT-FAILURE TO PROTECT

The "treatment a prisoner receives in prison and The conditions under which he is confined are subject to Scrutiny under The ~~Eghth~~ Eighth Amendment". HELLING V. MCKINNEY, 509 US. 25, 31 (1993). "[P]rison officials have a duty to ensure That prisoners are provided adequate Shelter, food, clothing, Sanitation, medical care, and personal Safety." JOHNSON V. LEWIS, 217 F.3d 726, 731 (9th cir. 2000); See also HUDSON V. PALMER, 486 US 517, 524-27; 104 S. ct. 3194 (1984).

Deliberate Indifference ("Del. Ind.") to conditions of confinement entails more Than mere negligence. But it can be proven by a standard less Than actual actions or omissions done (or not done) for The direct purpose of causing harm or with knowledge That harm will result. FARMER V. BRENNAN, 511 US 825, 836; 114 S. ct. 1970 (1994). This Standard of "purpose-ful" or "knowing" conduct is not, however, necessary to Satisfy The "mens rea", ("guilty mind"), requirement of deliberate indifference for claims challenging conditions of confinement ("cond. of conf."). The high state of mind standard established in WHITLEY does not apply to prison condition cases, with del. ind. lying on the spectrum Somewhere between The poles of "negligence" and "purposeful" / "knowing".

The court of appeals have routinely equated del. ind. with recklessness.

It is indeed fair to say that acting, or failing to act, with del. ind. to substantial risk of serious harm to a prisoner is the equivalent of reckless disregard [of that] risk. That does not, however, fully answer the pending question about the level of culpability del. ind. entails, for the term "reckless" is not self-defining. The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act, in the face of unjustifiable high risk of harm that is either known or so obvious that it should be known. PROSSER & KEETON SECTION 34 pp 213-44 restatement (second) of torts § 500 1965; FARMER @ 836.

when the state, by affirmative exercise of it's power, so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment. HELLING @ 32.

The courts have great difficulty agreeing with prison [officials] authorities that they may not be del. indifferent. to an inmate's current health problems but may ignore a condition of confinement that is sure, or very likely, to cause serious illness and needless suffering the next week or month or year. The courts think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. That the Eighth Amendment protects against future harm to inmates is not a novel proposition. Id. @ 33.

It is cruel and unusual to hold convicted criminals in unsafe conditions. It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening conditions in their prison on the ground that nothing yet had happened to them. The Court of Appeals recognized that a remedy for unsafe conditions need not await a tragic event—two of these cases were cited in RHODES V. CHAPMAN, 452 US. 337; 101 S.ct. 2392 (1981).

The Eighth Amendment protects against sufficiently imminent dangers,

as well as, current unnecessary and wanton infliction of pain and suffering. The courts reject (prison official's) central Thesis That only del. ind. to current serious health problems of inmates is actionable under the Eighth Amendment. HELLING @ 34. If a prisoner has been involuntarily exposed to a condition such that his future health is unreasonably endangered, he must prove that it is contrary to current standards of decency for anyone to be exposed against his will and that prison officials are del. ind. to his plight. Id. @ 33-35

The "obviousness" requirement in FARMER (Supra) does not necessitate a showing That an individual prison official had specific knowledge That harsh treatment of a particular inmate, in particular circumstances, would have a certain outcome. Rather, The courts measure what is obvious in light of reason and The basic general knowledge That a prison official may be presumed to have, obtained regarding The type of deprivation involved. THOMAS V. PONDER, 611 F.3d. 1144, 1151 (9Th cir. 2010). For Example, for The purposes of an obviousness analysis, a prison warden is deemed to have The general knowledge That is expected, at a minimum, of an individual performing The functions of That job. He cannot disclaim an understanding That is essential to The performance of his duties, as has been announced in cases for over 30 years. Id.

The FARMER (Supra.) standard is NOT designed to give officials motivation to "take refuge" in the zone between ignorance and actual knowledge. MAYORAL V. SHEAHAN, 245 F.3d.934,940 (9Th cir. 2000).


C. RETALIATION - FIRST AMENDMENT

PLAINTIFF utilizes Fed.R.civ.P 10(c) incorporating by reference DEFENDANTS' LEGAL STANDARD herein as if specifically stated as such. See Def. MSJ [ECF NO. 62 § IV (A)(1) (a) ] "... FIRST AMENDMENT

RETALIATION . . . '' pgs. 10-11 lns 1-16]

## III   CONCISE STATEMENT oF DISPUTABLE FACTS

Local Rule 56-1 states `That all motions for Sum. Jud. and responses to such motions' '' include a concise statement setting forth each fact material to the deposition of the motion That the party claims is or is not genuinely in issue, citing the particular portions of any pleading[s], affidavit[s], deposition[s], interrogatori[es], answer[s], admission[s], or other evidence on which The party relies.'' See also Fed. R. Civ. P. 56

DEFENDANTs have opted to rely on a Synopsis of This court's screening as opposed to PLAINTIFF's F.A.C. which is the operative complaint and is relevant herein at all times.

### A. FIRST AMENDMENT RETALIATION

1. Def. Gittere retaliated against PLAINTIFF's protected redress, under the guise of medical concern, by cell extraction by his CERT. officers and placed him in the infirmary under custody status. (Def. MSJ § II (A)(1) ∫ "Gittere's Alleged Retaliation" pg. 3 lns. 18-23); See Exh. A ¶ 3 - 4; F.A.C. ¶'s 41-44.

2. PLAINTIFF after being released from The infirmary, was placed in a red-tag cell[1], and he placed a grievance for retaliation, in his cell door which was taken by a correctional officer ("c/o") during mail pick up, on June 19, 2020. (Id. @ pg. 3 lns 23-25) See exh. A ¶'s 5 - 7; Exh. H

3. PLAINTIFF does not dispute That his own medical kite states "I am currently in The infirmary awaiting medical to do an evaluation, of what I don't know..." (Id. pg. 3 lns. 26-28).

This material fact supports PLAINTIFFs' claims of retaliation - cell extraction-

---

1. Red tag cells are cells That are not to be opened during tier time and a cell That prison officials have secured as a safety and security of The institution. PLAINTIFF was not allowed out his cell test handcuffed and/or shackled. AR 515 Exh. Q

placement in the infirmary under custody, as PLAINTIFF's comments was only reiterating Def.'s own words of "I'm concerned with your health ... medical will do an evaluation ..." See Exh. N. pgs. 2-4 for all similar responses.

Furthermore, Def. swore under penalty of perjury that 'he did not have PLAINTIFF placed in the infirmary under custody status' which is contradictive to the collective correspondence between PLAINTIFF and Def. Gittere. Id.; compare with Def. MSJ Ex. A-002 ¶'s 8,11, and 12.

4. PLAINTIFF disputes that these (2) two kites were submitted in '2021' as the record shows that they were both submitted in '2020'. (Def. MSJ §II(A)(1) pg. 4 lns. 2-3). See Def. MSJ ex. C-001 and C-002.

PLAINTIFF also disputes that he received a response [from Mental Health Specialist II Michelle day - nondefendant] on June 15, 2020, as their own evidence shows that the response was on June 17, 2020. (Def. MSJ §II (A)(1) pg. 4 lns. 3-4) See Def. MSJ ex. C-002.

5. PLAINTIFF does not dispute the he received the response of, 'you have been moved to a unit.' (Def. MSJ §II (A)(1) pg. 4 lns 3-4).

PLAINTIFF does dispute it's relevancy as def. Gittere had previously told him that he (DEFENDANT) would advice custody that he could return to a unit and just goes to show that def. had done so. See Exh. N pg. 5

In addition, PLAINTIFF was again going off of Def. Gittere's pre-designed guise of medical concern and wrote medical and Mental Health to strip def. from any further excuses to hold PLAINTIFF in the infirmary. If not done so it is questionable as to how long def. would have left PLAINTIFF in the infirmary under custody.

6. PLAINTIFF does not dispute that his own kite says 'the warden's concerned with my health ...". (Def. MSJ §II(A)(1) pg. 4 lns. 4 and 5).

---

3. Apparrently, def. claimed he did not order CERT to cell extract PLAINTIFF and place him in the infirmary under custody' but not knowing why he was there, he let him leave?!

As plaintiff was only reiterating def. Gittere's words as a response to why he had PLAINTIFF cell-extracted and moved to the infirmary under custody, this fact actually supports the fact that Def. Gittere had plaintiff moved to the infirmary. See Exh. N pgs. 1-4; Exh. B ¶'s 10-11; F.A.C. ¶'s 40-41.

B. EIGHTH AMENDMENT - COND. OF CON. (FAILURE TO PROTECT).

1. PLAINTIFF does not dispute Def. Gittere put the specific protocol of 'switching food' between food carts as a 'precautionary' measure to deter General Population ~~(GP)~~ ("GP") inmates from food tampering and poisoning Protective Segregation ~~Food~~ "Ps") inmates food. (Def. MSJ § II B pg. 4 lns. 14-15).

PLAINTIFF does dispute its efficiency as events continued to occur; despite this fact Def. Gittere failed to alter tactics which lead to PLAINTIFF having to eat another inmates feces and catch H. pylori, and despite multiple complaints thereafter, of GP using a caustic cleaning detergent know as 'white flash', def. still refused to alter tactics and/or take any further steps to protect PLAINTIFF. See Exh. A ¶'s 8 - 10; Exh. B ¶'s 4-6, 17 and 18; Exh. C ¶'s 4-7, 11; Exh. D ¶'s 4-7, 12; Exh. E ¶'s 3, 5-7; Exh. F ¶'s 5-11, 14 and 15; Exh. G ¶'s 5, 8; Exh. I generally all levels; Exh. N pg. 1; Exh. O pgs. -

2. PLAINTIFF disputes that Def. Gittere did not ignore complaints made by inmates. (Def. MSJ § II(B) pg. 4 lns 16).

Despite the facts that incidences continued to occurs and the fact that the 'switching of food' existed even in '2017', and PLAINTIFF was forced to eat feces and catch H. pylori in '2019' shows that Def. Gittere failed to protect PLAINTIFF and was on notice that his tactics had flaws, clearly shows that he ignored complaints and did not do enough to protect PLAINTIFF.

Furthermore, Def. Gittere has offered no evidence to support this suppositive fact other than a declaration that obviously contains many false statements

Furthermore, initial disclosures and production of documents unveiled no substantial investigative documents to support the establishing of any burden shift. Exh. L. @ `Response` No. 1, 4, 6, 9, 14, and 16.

3. PLAINTIFF disputes the reliability and integrity of Def. Gittere and his staff's investigations, as well as, def. Gittere ever having medical see PLAINTIFF over his complaints.

Def. Gittere and def. Homan have already been found to have made dishonest statements and perjured themselves to escape liability, as well, as, shown to be able to conduct interdepartmental conduct/actions without keeping documentation of incidences. See Exh. A 9i's - ; Exh. H; Exh. L @ `Response` No. 1, 4, 6, 9, 14, and 16.

4. Def. Drummond has provided no evidence to support his declaration. PLAINTIFF has insufficient knowledge to dispute such as Defendants failed to ensure records are made. Exh. L. @ `Response` No. 1, 4, 6, 9, 14, and 16.

Furthermore, PLAINTIFF disputes that this fact has any bearing on the outcome of this case, as he has found no evidence that can be found this def.'s name on any investigative documents and/or that dealing with PLAINTIFF. See Exh. L. Id.

5. PLAINTIFF does dispute that def. Ruebart has offered any declaration or evidence to support this fact, as such can not carry a burden to create any dispute or indisputable fact.

Further more, it seems this statement/fact is not based upon def. Ruebart's personal knowledge, but that of def. drummond who does so without offering any evidence to support such fact. Nor can PLAINTIFF locate any documents to dispute. See Exh. L. @ `Response` No. 1, 4, 6, 9, 14, and 16.

In addition defendants have already shown that of dishonesty

ⓡendering any investigations conducted by Them or their office unreliable.

*Falso in uno, falso in omnibus*

6. PLAINTIFF does not dispute That of def. Drummond's recollections. (Def. MSJ § II(B) pg. 4 lns. 21-22).

PLAINTIFF does dispute That a failure to recollect can create an indisputable or material fact. As well as, how an inability to recollect could have any bearing on the outcome of This case as The inability to recall simply states The inability to controvert facts within ~~PLAINTIFF~~ PLAINTIFFS F.A.C. PLAINTIFF disputes That This defendant has even carried his burden of stating an indisputable fact.

7. PLAINTIFF disputes The reliability and integrity of any investigation as investigations would of been passed down to def. Homan who has already shown to be dishonest (def. MSJ § II(B) pg. 4 lns. 23-24). See instant ⓡ(B)(3) and (5), and (8). Furthermore, defendants have not offered any evidence to support such.

8. PLAINTIFF disputes def. Homan's "non-participation ... acting disciplinary hearing Lieutenant ... does not have any knowledge of issues with E.S.P. culinary, etc." (Def. MSJ § II B pg. 4 lns 25-28 to pg. 5 ln 1). See Exh. M pg. 1 "Incident summary Report" under staff involvement; again pg. 4 of same last ¶ (naming def. as Sergeant not Lieutenant and asked by def. Gittere); again pg. 5 2nd ¶; lastly pg. 7 under staff involvement ("culinary Sergeant".

"*Falso in uno, falso in omnibus*"

9. PLAINTIFF can not dispute def. Verde's recollection (Def. MSJ § II (B) pg. 5 lns 1-4).

Plaintiff does dispute That This defendant can offer any indisputable facts and/or has done so without being able to recall any facts to establish a burden shift. Nor does This defendants recollection

have any bearing on the outcome of the case. If defendant can't recall any 'particular' complaints, he can't recall if he ignored them or not. Even belittling a complaint as an 'unfortunate accident' is the same as ignoring, especially when that 'unfortunate accident' could of tore PLAINTIFFS insides and/or lodge in his intestines causing Sypsis, etc. Feces in PLAINTIFFS food causing H. Pylori infection is not an 'unfortunate accident'. See Exh. I pg. 1 (Verde's signature and pg. 4 Verde's response.

10. PLAINTIFF does dispute def. Verde would regularly taste food prepared at E.S.P. (Def. MSJ § II(B) pg. 5 lns. 5 and 6). See Exh. D pg. 3 & 7.

## C. EIGHTH AMENDMENT-DEL. IND. SER. MED. NEED.

PLAINTIFF has reviewed and scoured documents on file, def's Exhibits, PLAINTIFF's Exhibits, his copies of answered and unanswered or still pending grievances and regretably admits that he is unable to locate any grievance on this issue and or even copies of such. Based on this fact PLAINTIFF must not waste the courts time on this claim. Thus voluntarily dismisses Def's Carpenter, Stark and Jones from instant suit.

## IV ARGUMENTS IN SUPPORT OF DENIAL OF DEFENDANTS' PURJURISTIC SUMMARY JUDGMENT MOTION

### A. RETALIATION

Def. Gittere is under the misguided assumption that PLAINTIFF must produce a signed letter from him stating "yes, I retaliated against you."

In no case to PLAINTIFFS limited knowledge does such

a case exist. In dark contrast, prison officials have learnt to disguise their retaliatory acts behind the favored "legitimate Penelogical Intrest" defense, which the courts have erroneously provided too much latitude with this misused defense.

   In this case, we see that Def. Gittere attempts to set-up this defense long before suit was filed under the guise of his "medical concern" which ... was the portiere used to hide his recreance and retaliatory actions by uprooting PLAINTIFF and essentially locking him away in an oubliette with the only way out, being to "expel any 'excuses' of being there in the first place."

  This Def. then for some reason backtracks; likely on the advice of counsel, and swears under penalties of perjury that he "did not order C.E.R.T. to cell extract" PLAINTIFF and "place him in the infirmary under custody" revoking his "medical concern" defense. Then oscillating again to argue "assuming" I did, it was out of "medical concern."

   "False" in uno; false in omnibus".

## I. MOTIVE REVEALED

    To support plaintiff's retaliatory motive, <u>RHODES V. ROBINSON</u>, 408 F.3d 559, 567-68 (9th Cir. 2004), Def. Gittere ordered his C.E.R.T. officers to cell extract PLAINTIFF and place him in the infirmary wherein he would be denied access to canteen, tier time, yard time, and locked in a cell 24 hours a day (Adverse Action); because of; PLAINTIFFS continued challenging of his inadequate protocols, his inability to protect PLAINTIFF as required by his duties, his lack of control of his GP inmates, and PLAINTIFFS comments of writing NV-cure and possible civil action for such against

him. (protected speech). See Exh. I; and specifically Exh. N pg. 1.

As Def. Gittere was attempting to silence PLAINTIFF by displaying his authority over his life. Exh. B ¶'s 12-16. Such does not advance any legitimate penological goal.

2. PERJURISTIC DECLARATION [3].

a.) Def. Gittere swore under penalty of perjury That he did not order C.E.R.T. to cell extract PLAINTIFF and place him in the infirmary under custody. (Def. MSJ ex. A-001 and 002 ¶'s 8, 11, and 12)

within his resonse to PLAINTIFFS Interrogatories was That he "did not recall issuing any such orders" which seems odd That he was now able to diffinitively state That he had not made any orders. Exh. K "response No. 7"; Exh. J "Response No. 3"

Even his own words suggest otherwise.

On June 6, 2020 Plaintiff sent def. Gittere a kite with The piece of metal that he found in his food attached to it, as advised to do so by his unit Staff. (kites to The warden on redress is protected speech / activity). F.A.C. ¶'s 39-41; Exh. B ¶'s 8 and 9; Exh. I generally; Exh. N pg. 1

Something This defendant denied 'receiving' in his sworn admissions Exh. J 'Response No. 4". Despite his own signature and offical stamp "wardens office". See Exh. N pg. 1

On June 8, 2020, (2) two days later plaintiff is cell extracted by C.E.R.T. and relocated to The infirmary under custody per def. Gitteres orders. F.A.C. ¶. 41-43; Exh. A ¶ 11 ; Exh. B ¶ 10,

3. PLAINTIFF believes That This court should issue sanctions against This defendant in The amount of #500.⁰⁰ (Five hundred dollars) to PLAINTIFF's Trust II prison account within (30) Thirty days as a means to discourage future dishonesty. See also instant @ III(B)3 and 7. Def. Homan's dishonest declaration

11, and 13-16.

That same night, PLAINTIFF sent Def. Gittere saying "you really didn't have to do This [cell extracting out of retaliation] . . . I have done nothing wrong. . . . and instead you retaliate against me."

Without denying, def. Gittere offers The excuse for his actions "I'm concerned with your health. medical will do an evaluation".
See Exh. N pg. 2 and 3

PLAINTIFF on June 10, 2020 sent def. Gittere another kite saying "you uproot me from my cell . . . immediately after I threaten to contact NV-cure and litigate The food issue you place me in custody?"

Again, Def responds "No, I'm concerned with your health" and even underlines it as if to emphasis his reasoning for cell extracting PLAINTIFF and placing him in The infirmary.
Exh. N pg. 4

Furthermore, while in The infirmary PLAINTIFF asked The c/o why he was There and he mocked PLAINTIFF by saying "oh yeah, you're The stupid one who kited The warden, That's why you are here". see F.A.C. ¶ 46

And when PLAINTIFF kited Medical, They responded with 'you are custody status' (Def MSJ Ex C-001)

Def. Gittere swore under penalty of perjury That 'he did not order C.E.R.T to cell extract PLAINTIFF and place him in The infirmary under custody' (Def. MSJ ex A-001 and 002 ¶'s 8, 11, and 12).

*Falso in uno, falso in omnibus.*

b.) As to defendant Gittere's argument That there is no entry into NOTIS (Nevada Offender Tracking System) That PLAINTIFF

was ever cell extracted is not surprising. Such documents were never made for this specific pre-designed argument. Again, NDOC officials learn from each civil action. Even more suprising, it does seem that this AG's office is collaborating with NDOC officials on ways to halt inmate litigation, as in most cases NDOC officials are usually unaware of civil actions against them and signatures are usually cut and pasted. [4.]

In this case PLAINTIFF STRONGLY believes that in a kite dated June 6, 2020 Def. Gittere was on alert of possible civil action to be taken against him and took several necessary steps to ensure that his retaliatory actions were not recorded, logged, or even documented. See Exh. J "Response No." 3, 7, 8, 9, and 19; Exh K "Response No." 7, 8, and 9; Exh L "Response No." 2, 3, 9, 12, and 16.

Even PLAINTIFF, a simple inmate made and secured better records than that.

To further boost this fact, Defendant's do not deny that PLAINTIFF was moved to the infirmary, as of course a 'historical bed movement' <u>MUST</u> be recorded to show an inmates location at all times. <u>YET</u>, not one single document exist to explain why he was there, who put him there, why C.E.R.T. was involved, --- ABSOLUTELY NOTHING. See Exh. J; Exh K; and Exh. L, all generally.

Well, except for PLAINTIFF's persistant documentation of events through kites, responses to, and declarations. Maybe PLAINTIFF should be hired by NDOC to teach them how to make

---

4. PLAINTIFF discovered this fact at the end of a previous case where in speaking to a defendant that supposively settled with PLAINTIFF stated that she had no idea she was even sued.

appropriate document at rise of events and record keeping. Pretty disgraceful and unethical for a state Department who has been getting away with things for too long. Ad Nauseam.

AND they expect this, Honorable Court to accept their reliability and integrity of their investigations.

*False in uno, false in omnibus.*

3. PROXIMITY IN TIME

Of course defendants have defiled this time-line to suit their continued misrepresentations to the courts, Ad Nauseam.

Defendants even adulterate the year to add to this timeline to a (2) two year span. "However, according to Espinosa's kite, he had been placed in the infirmary on or around June of 2021" (Def MSJ § IV (A)(1)(a) pg 12 lns 11-13; and lns 15-19).

The actual date was June 4th 2020, not (2) two years, but Eight or nine months from sept or october 2019, feces incident, in which plaintiff's protected speech began, *Scilicet*, verbal communication. F.A.C. ¶ 20 and 21.

Even PLAINTIFF agrees that this nine month period stands on unstable ground. Even so, PLAINTIFF's protected speech continued thereafter with verbal communications, grievances, and kites to def. Gittere. And specifically, PLAINTIFF has not alleged a nine month period but one of (2) two days and even one of an approximate 6 to 8 hours. see F.A.C. ¶'s 40-41.

This kite to def. Gittere is dated June 6, 2020, and the evidence shows that def. received and signed this kite by his official stamp and signature on June 8, 2020. see Exh. N pg. 1

Maybe not even Eight hours later, with no warning def. Gittere's C.ERT officers show up at PLAINTIFF's cell door, order him to roll

Pg 16 of 26

his property up, and threatened to MACE him and his then cellmate if he refuses per def. Gittere's orders. F.A.C. ¶ 41; Exh. A ¶'s 12-13; Exh. B ¶'s 10 and 11.

Timeline can not be any closer.

## 4. EXHAUSTION - RETALIATION

"Notably, a review of Espinosa's grievance history demonstrates the absence of any allegations of being in the infirmary under custody status..." [ECF No. 62 ¶ II(A)(1) pg. 3 lns. 23-25]

In difference to, the absence of any grievance being located on his Del. Ind. to Ser. med. need issue against Def. Carpenter, Stark, and Torres; here plaintiff was able to locate a copy of this grievance in his records, as well as, several mentionings to def. Gittere about this issue.

On June 8, 2020 Plaintiff addressed Def. Gittere's retaliation with him which he refused to respond to. Exh. N. pg. 2; also Exh. H pg. 1

PLAINTIFF even on June 6, 2020 stated in a grievance that of "Any form of retaliation will be address with civil action" which def. Gittere acknowledges he read his grievance. Exh. I pg. 3 and 6, respectively.

On June 19, 2020 @ 6:55 AM PLAINTIFF issued a grievance against Def. Gittere for retaliation by placing it in his cell door and was picked up during mail pick up. [5] see Exh. H pg. 2,3; Exh. A ¶'s 5

PLAINTIFF, after not receiving a response after (45) forty-five days def.'s have to answer his informal level, PLAINTIFF sent his unit

---

5: once leaving the infirmary plaintiff was immediately placed in a "red tag cell" and not allowed to leave his cell and his only option was to place it in his cell door to be picked up. C/o's refused to bring him the grievance box. Exh Q (red-tag cells"

caseworker a kite inquiring about The grievance on Aug. 8, 2020. see
Exh H pg. 4. [6]

   PLAINTIFF waited (Approximately) (2) two weeks and after no response
to That kite, PLAINTIFF Then sent def. Gittere a kite inquiring
about The unanswered retaliation grievance against him. see Exh.
H pg. 5

      when plaintiff got no response from def. Gittere either, he then
logically assumed That no remedy was available.

      BROWN V. VALOFF; "we refuse to interpret the PLRA so narrowly
as to ... permit [prison officials] to exploit The exhaustion requirement Through
indefinite delay in responding to grievances" ~~422 F.3d 926, 942-43 (9Th cir. 20--)~~;
LEWIS V. WASHINGTON, 300 F.3d 829, 833 (10Th cir. 2002); MILLER V. WILSON, 151 F.3d
292, 295 (5Th cir. 1998) (Per Curiam). [7] Delay in responding to a grievance, particularly
a time-sensitive one, may demonstrate That no administrative process is in fact
available. see JERNIGAN V. STUCHELL, 304 F.3d 1030, 1032 (10Th cr. 2002) (failure
to respond to a grievance within the time limits, contained in the grievance
policy renders an administrative remedy unavailable ... " FAULK V. CHARRIER,
262 F.3d 649, 698 (8Th cir. 2001) [affirming district court decision not to dismiss for
failure to exhaust when a department of corrections' failure to respond to a
preliminary grievance precluded The plaintiff from pursuing a formal grievance).
422 F.3d 926, 942-43 (9Th cir. 2005) @ [*18].

   PLAINTIFF's evidence even shows That on June 10, 2020 he sent def.
Gittere a kite to address his retaliation which This defendant refused to
answer. see Exh. H pg. 1

   PLAINTIFF has shown an attempt to ressolve issue before initiating his

_____

[6]. unit caseworkers in situations detailed in grievance are assigned This
level to respond to such.
[7]. PLAINTIFF had no knowledge That his grievance was never even entered into NOTIS,
maybe a response from his caseworker and/or def. Gittere could of apprised him of such.

grievance, per AR 740 in which def. Gittere refused to answer. Just as he did when inquiring about the unanswered grievance. Exh. N 1-5.

PLAINTIFF can not force NDOC officials to abide by their own complicated, ever-changing, and diluted policies designed to frustrate exhaustion.

In furtherance, PLAINTIFF has shown that Def. Gittere has the ability to order his C.ERT officers to cell extract PLAINTIFF and ensure no documents exist, its not a far fetch to allege that he can ensure grievances of retaliation never even get filed, and/or stricken from NOTIS, as seems to be here.

## VI.  EIGHTH AMENDMENT - COND of CON. - FAILURE TO PROTECT

### A.  ACKNOWLEDGED RIGHT TO BE PROTECTED

AR 509 details NDOC's acknowledgement that PLAINTIFF has a constitutional right to be protected from violence from other inmates. see also FARMER V. BRENNAN, 511 US. 425, 433 (1994) Def. Gittere recognizes this fact as detailed within his response to PLAINTIFF's Admissions. see Exh. J ("Response No." 1 and 2.

Def. Gittere, Ruebart, Drummond, Homan, and Werde further acknowledge this right as they have collectively implimented the policy of "switching food carts", which acknowledges this right expands to food sanitation and food poisoning as means of violent attacks. Even as early as 2017 this right has been recognized by defendants when they began receiving complaints. see Exh. F generally ; Exh. G ¶'s 5 and 8. Even years before PLAINTIFF arrived at E.S.P.

---

8. "switching food carts" simply means transferring one food pan from a ps food cart and switching it with a GP units food cart. Not actually switching the carts. and has been discovered was seldom done and when was it was usually the fruit pan, not the main meal. Exh. D (I) ¶ 6 - 13

## B. FAILURE TO PROTECT

PLAINTIFF arrived at ESP abouts Sept. 2019    and was unaware that there had been prior issues of food poisoning as he had come from a prison that did not have GP and PS inmates in individual units and/or one classification preparing anothers food.

It is without doubt that Def. Gittere, Reubart, Drummond, verde, Homan, and widham were aware that GP inmates will always attack a PS inmate any chance they get and have done so since the inventions of dual classification prisons.

Here we have GP inmates, who have been deemed to belong to a security threat group ("STG") that threatens the safety and security of the institution. Labelled such by NDOC. see Exh. R, generally

Def. Gittere, in disregard to GP/STG inmates security threat and their violence toward eachother, and especially PS inmates when given the opportunity, gives these inmates access to PS inmates' food that they need to sustain their lives.

Even prior to PLAINTIFF arriving at ESP Defendants (and all) were put on notice by inmates that their food switching policy was insufficient at protecting and detering GP inmates from poisoning and tampering with PS inmates food. see Exh. F; GP's 5 and 8; Exh. E ¶'s 3-7.

Despite those prior events, policies or tactics were never changed, altered, nor were the reported flaws corrected.

Due to these defendants multiple year issues and del. Ind. to PS inmates need for protection; despite complaints continuing to be made year after year, opted to recklessly leave these GP/STG inmates who these defendants have deemed to be a security threat to

remain in The culinary where They have access to Ps inmates food.

Even on May 25, 2019, %0 Delfonte (a. non-defendant) notified Def. Verde concerning foreign substances in The Oatmeal, who then notified Def. Homan. without even investigating, Defendants claimed That it was reminents from the night before dinner and to just serve it.[9]. This is essentially ignoring complaints even made by their own staff not just by inmates. see Exh E ¶'s 5-7. This shows Their frustration with This issue and that it has been occurring for some time now. Def. Gittere, Verde, and wickham in response to every grievance filed was simply That of "Protocols are being followed"; "cart switching is being done"; and "All inmates are Supervised". The same "cut and paste" statement to nearly over (40) forty or more grievances from Ps inmates since "atleast" 2017. This, in-itself, shows del ind. on a large scale. This fact alone shows why defendants are so eager to deny PLAINTIFF's production of documents' request No. 1', as "sensitive information", "overbroad and burdensome", and "breach of confidentiality". Exh L (Request No. 1)

The fact That These defendants began to display Their frustration even before PLAINTIFF's incident and their cut and paste responses to grievances shows That These defendants were deliberately indifferent.

Then, despite defendants refusal to alter tactics and/or remove inmates labelled and proven to be a security Threat, only (24) twenty four days later GP inmates were able to attack PLAINTIFF by putting Their féces; 'apparently in large amounts showing a collective effort as over (43) forty-Three inmates had acknowledged consuming The meal (or portions of). see

---

9. This is The exact statement PLAINTIFF usually got from Def. Verde and Homan when he reported issues to his unit officers. "Verde and Homan told us to just serve it and stop reporting Things." and "Sgt. Homan keeps telling us (unit staff) to stop reporting Things". Exh. A ¶'s 14-16; also Exh. D(II) ¶'s 11, 12, and 13.

Exh. M pgs 2 and 3. Causing a large number, nearly (20) twenty or more inmates to catch H. pylori. Exh. A ¶'s 17-19; Exh. C ¶ 8; Exh. D(I) ¶ 8. See also 'webmd.com' (H. pylori).

To further show defendants del. ind., the event occurred on Sept. 18, 2019 in which unit staff called Def. Gittere who came to the unit with medical that same evening. See Exh. A ¶'s 19-20; Exh. C ¶ 4 & 7; Exh. D & D(I) 4 & 7; yet, defendants Gittere, Numan, and Verde were so eager to go home that no documentation was taken till the next day and is why 'no comments' exist in the comments section (by inmates) see Exh. M pgs. 1-5 (specifically 2 and 3); Exh. K 'response No.' 5 & 6.

<u>COLWELL V. BANNISTER</u>; 'the defendant official[s] must have actual knowledge from which to infer that there was a substantial risk of harm to the inmate's health or safety, and he/she must also have made that inference.' 763 F.3d 1060, 1066 (9Th cir. 2014).

Not only have Defendants acknowledged a substantial risk but have also made the inference via their 'supposive' precautionary measures of cart switching. See also Exh. I 'Response No.' 1 & 2; Exh. K 'Response No.' 13; Exh. I, generally.

As these defendants' have recieved and responded to multiple grievances throughout years even prior to this incident and been told several times that the cart switching was not working and opted to 'consciously disregard' the 'excessive risk to the prisoner's health ... be found constitutionally infirm'. <u>TOGUCHI V. CHUNG</u>, 391 F.3d 1051, 1058 (___) (quoting ; <u>JACKSON V. MCINTOSH</u>, 90 F.3d 330, 332 (9Th cir. 1996). In addition, it is II where the decision results in harm to the PLAINTIFF - though the harm need not be substantial - that EIGHTH AMENDMENT liability arises. <u>JETT V. PENNER</u>, 439

F. 3d @ 1096.

Even after this event PLAINTIFF continued to advice Def. Gittere, Ruebart, Drummond, Homan, Verde, and Wickham that cart switching was not working as GP told him and his cellmate that they were using 'white flash' a caustic cleaning detergent, and that it was CERT officers who hated Ps inmates telling them which carts were being switched. See Exh. A ¶'s 21-23; _____ Exh. I (Gittere, Verde, and Wickham); F.A.C ¶'s 23, 26, 40, 53, 54, 56.

Def. Gittere even mocked PLAINTIFF's concern of the caustic cleaning detergent known as 'white flash'. "ESPINOZA-There is no such thing as 'WHITE FLASH'.[10]" As if def. had no idea about chemicals used in his prison. See Exh. O pg. 7. Instead of mocking PLAINTIFF Defendants should have removed the security threat inmates. And even remove the odorless and tasteless cleaning detergent that causes what became known as 'bubble guts' which was obviously. The intestines being damaged. But NO, Def's settled for mocking and placading of 'I'll have your complaints investigated by IG/compliance office'. which seemed to not of been conducted. see Exh.O pg. 7; Exh L 'Response NO.' 6 and NO. 16. or even reported.

PLAINTIFF then sent Def. a kite with a piece of metal that was thin (approx. 5/4 inch. long × 1/8 in. width) attached to it as evidence per his unit officers advice. (unit officers became fearful to report issues themselves anymore due to Def. Homan and Verde's disapproval of

10. "white flash" is a ball size concentrated caustic detergent used throughout NDOC. It is known as "white flash" because the identical detergent that was used prior to this one was yellow and called "yellow flash". The only differences is that E.S.P. switched to the white one because it is tasteless and odorless as opposed to the yellow one that had a strong smell. The fact that ONLY Ely switched to this odorless one poses its own risk in and of itself. and makes no logical sense. lest giving Ammo.

pg. 24

Such], see F.A.C. ¶'s 37-40; Exh. B ¶16-9; Exh. N pg. 1 (blank spot was where the metal was taped) In response Def. Gittere sought to retaliate against PLAINTIFF. See Instant @ § IV (A).

PLAINTIFF Then filed a grievance wherein defendants Verde, Gittere, and wickham continued with Their same cut and paste responses. And even displayed their disregard for PLAINTIFF's safety and health by calling it an "unfortunate accident". See Exh. I pg. 4, 6, and 10. An "unfortunate accident" That could have caused severe harm and even death or sepsis. Something That fits with GP's poisoning intentions.

They belittled PLAINTIFF even more by saying and sanctioning The response of "your complaint was the only one received of that meal" see Exh. I pg. 4 (by Verde), pg. 6 (agreeing with such by Gittere), and pg. 10 (agreeing with such by wickham).

## C. INVESTIGATION

Defendants wish to state That investigations was done in response to reports and complaints by inmates. And Allege That no evidence was ever found That GP inmates were poisoning PS inmates food. Supporting such fact with equivocal declarations already shown to be deceitful.

"False in uno; false in omnibus"

PLAINTIFF had also just shown how defendants belittled, and disregarded, and even mocked PLAINTIFFS claims. PLAINTIFF has shown how defendants refused to produce documents of those supposive investigations Through discovery, and even failed to produce any documents of those investigations. PLAINTIFF has even shown how Def. Homan and Verde used to tell Their own

Pg. 2 J of 29

unit C/o's to 'stop complaining' and 'returning carts' and to 'just serve it'. How def. Homan swore under penalty of perjury That he had no knowledge of The culinary, PLAINTIFF proved Through documents provide from mitral disclosures produced by defendants That he was The "culinary Sergeant." PLAINTIFF has shown how defendants have horrid and flagitous record keeping when it could prove Their failures and immoral attributes. PLAINTIFF has shown how defendants can send CERT to cell extract some-one without There being any record or logs made. How grievances can never be fited and kites inquiring of such can never get answered. How They can be recreant towards serious needs of protection.

In contrast They expect This court to believe That no inmate has ever been seen, caught, or charged when incidents are shown to occur time and time again. Lastly, PLAINTIFF has already proven That with every new recrudescence That he suffred some harm or near harm. Such as The metal incident That PLAINTIFF and his cellmate had to be vigilant enough to start washing Their food; which seems absurd in a modern society, That he could have swallowed a sharp, potentially deadly foreign object, and Defendants blow him off by claiming an "unfortunate accident".

Yet any investigation conducted by individuals of such disregard, lacking moral aptitude, and offer blatantly deceitful sworn testimonies, can be ever relied upon.

'As to no camera footage ever showing'... Defendants have vicariously admitted to blind spots by claiming a security & confidential matter. See exh. k 'response No." 3; Exh. L "response No." 9. compare with

exh. D pg. 2 ¶'s 10 and 11 ; Exh. C ¶'s 9 & 10.

As to all inmates in culinary are supervised at all times, see Exh D(II) ¶'s 3-6. The claim That food pans were switched, it was GP who would switch them not free staff or C.ERT or a prison official. Exh D(II) ¶ 8 and 9. Furthermore, apparently each unit has a different serving count so the only pans switch was the fruit pans. Exh. D(II) ¶ 10. In furtherance, PLAINTIFF verbally told def Gittere That The pans cellephane covering clearly have unit's numbers on Them. Including one That showed a GP units number on it showing it had been switched. F.A.C. ¶© *3. In response to Plaintiff's Interrogatory No. 17, Def. Gittere offered "The marking or remarking of food pans..." Ironic def. Throws in "_re_marking" because There were no _re_-marking of The pans, as PLAINTIFF's verified F.A.C. stated he'd see other unit numbers on The cellophane. This is another equivocation to escape liability. which defendants have shown time and time again. And to claim That of Random sit downs to eat meals, "beef stew was good." [11] exh.O pg 2. Yeah, PLAINTIFF agrees it probably was good because his staff would ensure That it was. Further, PLAINTIFF in all his time in E.S.P. only ever saw Def. Gittere sit in on one single meal. Pizza night which is hard to poison as its difficulty to mix feces or chemicals in without it being noticeable. Exh. A ¶ 24

VI  IRRELIVANT, BOILERPLATE, AND EXHUSTING ARGUMENTS.

A. SUPERVISOR LIABILITY

PLAINTIFF has shown how every defendant participated in Their own actions and how They played a role in violating

---

11. The fact That Def. Gittere mentions his sitting down to eat beef stew and it was good is comical. He admited he did such in unit 5B. "A GP UNIT".

his rights. Thus Supervisor liability here does not exist. "A Supervisor/administrator can be held culpable by their action or omission. STARR V. BACA, 652 F.3d 1202, 1206-07 (9TH Cir. 2011) or when a supervisor/administrator reviews a grievance (sufficiently stating a constitutional violation) and fails to take reasonable action to cure/eliminate the constitutional deficiencies. JETT @ 1098 (9TH Cir. 2006).

## B QUALIFIED IMMUNITY

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. PEARSON V. CALLAHAN, 555 US 223, 231 (2009). Qualified immunity is an immunity from suit rather than a defense to liability and "ensures that officers are on notice their conduct is unlawful before being subjected to suit." TARABOCHIA V. ADKINS, 766 F.3d 1115, 1121 (9TH Cir. 2014) IN Deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, whether (1) the facts show the officer's conduct violated a constitutional right and (2) if so, whether the right was clearly established at the time. Id.

Qualified Immunity has become more of a boilerplate argument as plaintiffs rights to be free from retaliation and to be protected is clear established law. see instant § IIBI&IIAIII

In deciding a claim of qualified immunity where a genuine issue of material fact exists, the court accepts the version

of the nonmoving party. ELLINS V. CITY OF SIERRA MADRE 710 F.3d 1049, 1064 (9th cir. 2013). Summary Judgment must be denied where a genuine issue of material fact exists that prevents a finding of qualified immunity. SANDOVAL V. LAS VEGAS METROPOLITAN POLICE DEPARTMENT. 756 F.3d 1154, 1160 (9th cir. 2014).

VII    CONCLUSION

DEF's have failed to meet their burden of showing that any indisputable fact exist that would warrant any granting of their perjuristic summary judgment motion.

Plaintiff has shown that a jury is capable of accepting his version of the facts. Where the facts have infered that defendants have perjured themselves on several occasions to escape liability and appear to lack the moral aptitude of their positions as correctional employees. That defendants relied on the same responses time and time again as a means to say ; ... 'We did Something', despite their refusals to do more when told that their 'something' was not working and PLAINTIFF continued to have symptoms, caught H. pylori, and metal in his food, etc.

PLAINTIFF has provided not only a refuting declaration but (16) sixteen admissable exhibits as opposed to defendants' perjuristic declarations.

PLAINTIFF also voluntarily dismiss: defendants carpenter, stark, and Jones from instant suit as he's found no grievance or copies Thereof concerning medical Del. Ind. to serious medical need, and thus revoking his medical Del. Ind. Eighth Amendment claim against these defendants.

PLAINTIFF does thank this Honorable Court for its patience with this Pro se inmate litigant who has done the best he could

to proceed with integrity and civility.

DATED This 6 day of July, 2023

submitted by,

Benjamin WF Espinosa

Benjamin WF Espinosa

PLAINTIFF, IN PRO Se.

= CERTIFICATE OF SERVICE =

I, certify that I have placed my response to defendants Summary Judgment motion in interdepartmental mail to be e-filed to the courts using its CM/ECF system. As Defendants counsel is an active participant, she will be served as such.

DATED This 18 day of July, 2023

Janet Traut, Esq.

Deputy Attny Gen.

Defendants counsel

Benjamin WF Espinosa #74296

HDSP - PO Box 650

Indian Springs, NV. 89070-0650

PLAINTIFF, IN PROPER PERSON